# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TK HOLDINGS INC., *et al*.,<br><br>                   Debtors. | Chapter 11<br><br>Case No. 17-11375<br><br>Jointly Administered<br><br>Adv. Pro. No. 18-50274 |
| Automotive Coalition for Traffic Safety, Inc.<br><br>                   *Plaintiff*,<br><br>    v.<br><br>Joseph J. Farnan, Jr., not individually but solely as Trustee of the Reorganized TK Holdings Trust, and Joyson Safety Systems Acquisition, LLC,<br><br>                 *Defendants*. | |

**MAYER BROWN LLP**
James R. Ferguson, Esq.
Melissa A. Anyetei, Esq.
71 S. Wacker Drive
Chicago, Illinois 60606

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Richard M. Beck, Esq.
Sally E. Veghte, Esq.
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801

Morton R. Branzburg, Esq.
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103

*Attorneys for Plaintiff Automotive Coalition for Traffic Safety, Inc.*

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
Stephen M. Ferguson, Esq.
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801

**BROOKS KUSHMAN P.C.**
Frank A. Angileri, Esq.
Linda D. Mettes, Esq.
Robert C.J. Tuttle, Esq.
Amy C. Leshan, Esq.
1000 Town Center, 22nd Floor
Southfield, Michigan 48075

*Attorneys for Defendant Joyson Safety Systems Acquisition LLC*

## OPINION[1]

Before the Court are cross-motions for summary judgment in this Adversary Proceeding. The dispute centers on ownership of certain patents rights (the "Patent Assets")[2]. Automotive Coalition for Traffic Safety ("ACTS" or the "Plaintiff") brought an adversary proceeding against Chapter 11 debtor, TK Holdings Inc. (hereinafter, "Takata") seeking a declaratory judgment that certain Patent Assets are not the property of the bankruptcy estate because they belong to ACTS. Takata contends that the Patent Assets belong to it and may thus be sold and transferred to Joyson Safety Systems Acquisition LLC ("Joyson") under the terms of Takata's Fifth Confirmed Amended Joint Chapter 11 Plan of Reorganization (the "Plan").[3] For the reasons that follow, the Court finds that under the terms of the contract executed by the parties, the Patent Assets are the property of ACTS, not Takata, and therefore were not transferred to Joyson under Takata's Plan. Summary Judgment will be entered in favor of ACTS, and Takata's cross-motion will be denied.

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that this Court's authority is determined to be within the parameters of 28 U.S.C. § 157(c)(1), this Opinion and the accompanying Order shall be deemed to be the Court's proposed findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 9033.

[2] ACTS' Complaint defines the "Patent Assets" as: (a) U.S. Provisional Patent Application No. 61/451,082, filed on March 9, 2011 ("the '082 Application"); (b) U.S. Patent Application No. 13/415,767, filed March 8, 2012, which matured into U.S. Patent No. 8,479,864; (c) U.S. Patent No. 8,479, 864, which issued July 9, 2013 ("the '864 Patent"); (d) International (PCT) Patent Application No. PCT/US2012/028295, filed March 8, 2012 ("PCT '295"); (e) European Patent Application No. 12754647.1, filed March 8, 2012 ("EP '647"); (f) Japanese Patent No. JP6121916 (B2), filed March 8, 2012 and issued April 7, 2017; (g) Chinese Patent Nos. CN103476623, filed March 8, 2012 and issued November 9. 2-16 and (h) any and all other U.S. or foreign patents or patent applications which claim benefit of the foregoing patents and/or patent applications.

[3] Findings of Fact, Conclusions of Law, and Order Confirming the Fifth Am. Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors, Feb. 21, 2018, Docket No. 2120 ("Order Confirming Plan").

## I. BACKGROUND

### A. General

Prior to commencing these Chapter 11 proceedings, Takata was a leading global developer and manufacturer of automotive safety and non-safety systems, including airbags and seat-belts.[4] The record reflects that, among other products, Takata manufactured airbag inflators containing phase-stabilized ammonium nitrate ("PSAN"), which had the potential to rupture upon airbag deployment, causing death and serious injury to automobile occupants. In response to multiple reports of injuries caused by PSAN inflators in vehicles, the National Highway Traffic Safety Administration ("NHTSA") initiated the largest product recall in U.S. history.

Takata filed for Chapter 11 protection on June 25, 2017. Takata's Plan was structured around a sale of substantially all of its assets to Joyson. Included in that proposed sale were the Patent Assets at issue here. ACTS timely filed a Limited Objection to confirmation of Takata's proposed plan (the "Objection").[5] As described more fully below, ACTS objected to the proposed sale of U.S. Provisional Patent Application No. 61/451,022 (the "082 Application") and certain other patents and patent applications, contending that these Patent Assets were the property of ACTS, not Takata, and thus could not be sold to Joyson under the Plan. To resolve ACTS' Objection in advance of the confirmation hearing, the parties agreed that the Plan could be confirmed and the question of ownership of the Patent Assets would be reserved for later disposition. In a nutshell, the parties carved the Patent Assets out of the sale to Joyson; if Joyson prevails here, it will be the owner of the Patent Assets. If ACTS prevails, then it is the owner and the Patent Assets will not have been sold and transferred under the Plan.

---

[4] As the instant dispute between these parties has little to do with the circumstances leading to Takata's collapse, the Court provides here only the most general overview of these otherwise enormously complex Chapter 11 proceedings.
[5] Limited Objection to Confirmation of the Third Am. Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors, Feb. 6, 2018, Docket No. 1948.

The Court entered an order confirming Takata's Plan on February 21, 2018.[6] As noted, the Order confirming the Plan specifically preserved ACTS' Objection until a later hearing date and did not include the Patent Assets in the sale.[7]

ACTS filed a Complaint and commenced this Adversary Proceeding against Takata seeking a declaration that ACTS owns the Patent Assets and further seeking an injunction barring Takata from selling the Patent Assets in its bankruptcy case.[8] Takata has responded and asserted in its Answer that the Patent Assets are property of Takata's bankruptcy estate, are not owned by ACTS and were properly sold and transferred to Joyson under the Plan.

**B. The Patent Assets**

ACTS partnered with NHTSA in 2008 to develop a new alcohol detection system that would help prevent alcohol-impaired driving. The research program, called the Driver Alcohol Detection System for Safety ("DADSS"), was to proceed in two phases. Phase I of the project contemplated the development of a touch-based alcohol detection sensor (the "Sensor") to measure a driver's blood alcohol level from the driver's fingertip. During Phase II, the Sensor would be further developed so that it could be incorporated into a motor vehicle. ACTS hired TruTouch Technologies, Inc. ("TruTouch") to develop the sensor for Phase I of the project, which concluded in late 2010. For Phase II, ACTS required that TruTouch partner with an automobile manufacturer to develop a product that could operate reliably in an automobile.

ACTS issued a Request for Proposal[9] ("RFP"), and the record reflects that TruTouch contacted Takata representatives to partner with Takata on the project and utilize Takata's deep

---

[6] Order Confirming Plan, Docket No. 2120.
[7] Order Confirming Plan, Docket No. 2120 at ¶ 97.
[8] Adversary Proceeding No. 18-50274; Docket No. 1. A stipulation was entered between ACTS, Joseph Farnan, Jr. solely as Trustee of the Reorganized TK Holdings Trust as successor in interest to Defendant TK Holdings, Inc. and Joyson on May 15, 2018. Order Approving Stipulation, Docket No. 34.
[9] App. to Opening Br. in Support of Def. Joyson Safety Systems Acquisition LLC's Mot. for Summ. J. A265, May 23, 2019, Docket No. 95.

experience in the development and manufacture of automobile devices and systems. Takata investigated the potential partnership with TruTouch and identified certain deficiencies in TruTouch's model. One area of concern was the inability to ensure that the driver, and not a passenger, was the one touching the sensor. Because the whole purpose of the project was to develop a product that would determine whether a driver was under the influence of alcohol and prevent him from operating the vehicle, it was essential that an inebriated driver is not able to circumvent the system by having a sober passenger engage the sensor.

Engineers at Takata used existing Takata technology and capacitive seat sensors to develop an anti-circumvention mechanism that addressed the perceived inadequacy in TruTouch's model. Takata entered into a Memorandum of Understanding with TruTouch on December 17, 2010 and responded to ACTS' RFP on February 9, 2011. ACTS replied to Takata's proposal and invited it to present its proposal at a meeting to be held on March 10, 2011.

In connection with that invitation, ACTS also requested further information on the anti-circumvention mechanism. Takata filed the '082 Application on March 9, 2011 (one day prior to its scheduled meeting with ACTS) and attended the meeting on March 10, 2011. During that meeting Takata presented a PowerPoint and explained that it had a "proprietary method" to solve the circumvention problem. It explained that its "proprietary method" of detecting passengers for airbag deployment could be modified to determine whether a person touching a sensor was a driver or a passenger. ACTS selected Takata for Phase II of the project and maintains that Takata's proposed method was a "key consideration" in ACTS' decision to award Phase II to Takata. The parties commenced a negotiation period that lasted approximately five months and eventually signed a contract on September 1, 2011 (the "Agreement"). The Agreement includes certain provisions that are at the center of the dispute.

The first relevant provision of the Agreement is Section 13(a)(i), which governs ownership of technology created pursuant to the Agreement. That section provides as follows:

> ACTS owns, and shall continue to own, all worldwide rights, title, and interest in and to all Work Product (including all Intellectual Property Rights therein) which is developed under this Agreement.[10]

Accordingly, the definition of "Work Product" also plays a major role in the Court's determination of this dispute. "Work Product" is defined under the Agreement as:

> [A]ny and all Deliverables, inventions, improvements, technology, software, hardware, modifications, enhancements, derivatives, translations, compositions, discoveries, data, know-how, processes, methodologies, formulas, designs, drawings, data, information, or works or authorship **which are or were, after February 9, 2011, developed, discovered, invented, authored or first used or reduced to practice** by Subcontractor, Tier Two Subcontractor, or any Third Party Contractor, whether alone or jointly with ACTS or any third party, in connection with this Agreement, in the course of performing Services or otherwise for or on behalf of ACTS.[11]

The parties also disagree over whether the Patent Assets constitute "Background IP" and are therefore the property of Takata. "Background IP" is defined under the Agreement as:

> [A]ll software, hardware, technology, inventions, improvements, modifications, enhancements, derivatives, compositions, discoveries, Intellectual Property, processes, methodologies, formulas, designs, drawings, data, translations, know-how, or works of authorship (whether in draft or final form and whether in written, electronic or other format) in which a Party or any Third Party Contractors owns any proprietary right anywhere in the world, and which was acquired, licensed, developed, discovered, invented, authored, or first reduced to practice by such Party or any Third Party Contractor, alone or jointly with others, (i) prior to the Initial Signing Date, or (ii) outside of the scope of the Services of this Agreements not within the Field and without funding by ACTS, and in each case is listed on Schedule C. The term "Background IP" does not include any Third-Party IP or Work Product.[12]

---

[10] App. to Opening Br. in Support of Def. Joyson Safety Systems Acquisition LLC's Mot. for Summ. J. A081, May 23, 2019, Docket No. 95.
[11] App. A081, Docket No. 95, (emphasis added).
[12] App. to Opening Br. in Support of Def. Joyson Safety Systems Acquisition LLC's Mot. for Summ. J. A081, May 23, 2019, Docket No. 95.

The parties filed and fully briefed cross motions for summary judgment, each asserting ownership of the Patent Assets.[13] The Court heard oral argument and took the matter under advisement. This matter is ripe for disposition.

## II. JURISDICTION, VENUE AND LEGAL STANDARD

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157(b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), and (O).

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue of material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The movant bears the burden of establishing the absence of a genuine issue of material fact. Id. at 322-23. If the movant is successful, the burden then shifts to the respondent to establish that summary judgment is not warranted. Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The opposing party must produce specific facts that establish the existence of a genuine dispute. Id. at 587. It is not sufficient to defeat a motion for summary judgment for the respondent to merely allege a factual dispute. Anderson, 477 U.S. at 247-48.

---

[13] Def. Joyson Safety Systems Acquisition LLCs Mot. for Summ. J. May 23, 2019, Docket. No. 93; Pl. Automotive Coalition for Traffic Safety, Inc.'s Mot. for Summ. J. July 15, 2019, Docket No. 112.

Further, the Court must view all facts and draw all inferences in favor of the respondent. *Id.* at 261 n.2; Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 512 (3d Cir. 1994). A motion for summary judgment may only be denied "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita, 475 U.S. at 587 (citation omitted). Therefore, the Third Circuit Court of Appeals has held that "in all cases summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." Petruzzi's IGA Supermarkets v. Darling-Del. Co., 998 F.2d 1224, 1230 (3d Cir. 1993).

## III. THE PARTIES' POSITIONS

Takata maintains that it is the presumptive owner of the Patent Assets and that ACTS bears the burden of proof in overcoming that presumption. First, Takata takes the position that the Patent Assets were not "Work Product" developed "for or on behalf of ACTS" under the Agreement because Takata filed the '082 Patent Application on March 9, 2011, five months prior to signing the Agreement with ACTS, so that it could not have developed the invention under the Agreement. Second, ACTS directed Takata that Takata was not authorized to begin work until Takata received a signed, authorized contract. Third, the Agreement between ACTS and Takata does not address anti-circumvention technology, and instead only focused on the blood alcohol sensor. Finally, Takata contends that the Patent Assets are by nature public information and therefore cannot be considered "Confidential Information" under the Agreement.

In response, ACTS asserts that it is the owner of the Patent Assets. It alleges that the plain language of the Agreement expressly provides that ACTS is the owner of any "Work Product," which includes inventions resulting from work done for or on behalf of ACTS after February 9,

2011. First, the invention in dispute was devised after February 9, 2011 because Takata filed its Patent Application on March 10, 2011. Under applicable law, an "invention" requires both "conception" and a "reduction to practice," each of which occurs as a matter of law when an inventor files an application. Second, ACTS argues that the invention falls under the "Work Product" definition which encompasses work that was done prior to the signing date of the Agreement because Takata invented the device "for or on behalf of ACTS." Third, Takata developed the invention for ACTS because ACTS stressed to Takata that Takata's proposed system would need an anti-circumvention component and that this component would be critical to the project. Finally, ACTS contends that Takata effectively acknowledged that the Patent Assets were "Work Product" "for or on behalf of ACTS" because Takata did not include the Patent Assets in its schedules as Background IP.

## IV. DISCUSSION

The Agreement provides that the "Subcontract shall be governed by and construed and enforced solely and exclusively in accordance with the laws of the state of New York . . .." When interpreting a contract under New York law, "the words and phrases in a contract should be given their plain meaning, and the contract should be construed as to give full meaning and effect to all of its provisions." See Chesapeake Energy Corp., 773 F.3d 110, 113-14 (2d Cir. 2014) (citations omitted). Another longstanding rule in contract interpretation is that "a reading of the contract should not render any portion meaningless." See Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 834 N.Y.S.2d 44, 865 N.E.2d 1210, 1213 (2007). When the terms of a contract are clear and unambiguous, the court will use the four corners of the agreement to determine the parties' intent. See In re Am. Home Mortg. Holdings, Inc., 390 B.R. 120, 135 (Bankr. D. Del. 2008) (citations omitted).

For purposes of summary judgment, the dispute in this matter centers on the ownership of the Patent Assets. To answer that question, the Court looks to the Agreement between the parties and specifically to the seven-month look-back period contemplated by Section 13(a)(1), the definition of "Work Product," and what was excluded as "Background IP."

Typically, the effective date of a contract is the date the parties signed the Agreement. Here, however, the Agreement between Takata and ACTS contemplated an effective date that was almost seven months prior to the date the parties signed the Agreement. As noted earlier, the "Work Product" definition in the Agreement included an effective date of February 9, 2011. Anything created on or after February 9, 2011 for or on behalf of ACTS thus was intended to become the property of ACTS.

> *a. The Invention is Work Product because it was completed as a matter of law after the February 9, 2011 effective date*

Under the Agreement, "Work Product" has two requirements; (1) that the invention be developed, discovered, invented, authored or first used or reduced to practice after February 9, 2011 and (2) that the work was done "in connection with this Agreement in the course of performing services, or otherwise for or on behalf of ACTS."

Takata asserts that its invention does not fall under "Work Product" because its anti-circumvention invention was neither developed under the Agreement nor "for or on behalf of ACTS." Takata notes that it filed its patent application and thus completed the invention as a matter of law more than five months before the Agreement was signed. Takata explains that an invention is deemed a "constructive reduction to practice" and therefore complete as a matter of law when a patent applicant files a patent application. Pfaff v. Wells Electronics, Inc., 525 U.S. 55, 66 (1998).

Takata filed its patent application on March 9, 2011, which was before the date the parties signed the Agreement on September 1, 2011. Takata argues the invention was completed when it filed the application on March 9, 2011 and therefore could not have been developed "under the Agreement." However, Takata fails to address the February 9, 2011 date contained in the "Work Product" definition. Takata and ACTS spent approximately five months negotiating the terms of Agreement and included an effective date of February 9, 2011 in the definition of Work Product.

Under the Agreement, ACTS owns all "Work Product." Anything that was "developed, discovered, invented, authored or first used or reduced to practice" after February 9, 2011 falls within this definition. The Agreement is unambiguous and therefore provides that ACTS owns the Patent Assets because the Patent Assets were "developed, discovered, invented, authored or first used or reduced to practice" on March 10, 2011, which is after the February 9, 2011 effective date.

*b. The Patent Assets are Work Product because they were developed "for or on behalf of ACTS"*

The record reflects that Takata understood that ACTS was interested in anti-circumvention and that the anti-circumvention component was crucial for the project.[14] Back in December 2010, Takata had initially invested $500,000 into TruTouch so that the two parties could work together to fulfill the DADSS/ACTS contract that was awarded to TruTouch.[15] Takata then submitted a response to ACTS' Request for Proposal for the development of a touch-based alcohol detection system. ACTS sent a reply back to Takata on February 28, 2011 stating that the proposed system

---

[14] White Tr. 78:3 – 78:8, Docket No. 95.
[15] Opening Br. in Supp. of Def. Joyson Safety Systems Acquisition LLC's Mot. for Summ. J., Automotive Coalition for Traffic Safety, Inc., v. Joseph J. Farnan., and Joyson Safety Systems Acquisition LLC, Docket No. 94 at 8 ("Takata Opening Brief") ("TruTouch had contacted TKH because, for Phase II of the DADSS program, ACTS required it to partner with an established auto industry manufacturer to improve vehicular suitability of TruTouch's bulky BAC sensor . . . "); White Tr. 32:13 – 33:8, Docket No. 95.

would need to contain an anti-circumvention component.[16] Takata then made a presentation to ACTS on March 10, 2011 proposing that Takata's airbag detection system could be modified and used with a touch-based alcohol detection system. Therefore, Takata was aware that ACTS required an anti-circumvention component as early as February 28, 2011, months before the parties signed into the Agreement.

Takata argues that its engineers came up with the anti-circumvention idea in November 2010 when Takata initially contacted TruTouch, before ACTS had sent out its Request for Proposal.[17] This may be true, but it does not answer the question whether the technology was developed for or on behalf of ACTS. When Takata initially contacted TruTouch, Takata was aware that TruTouch had partnered with ACTS.[18] Takata reviewed the model that TruTouch was developing for ACTS before Takata decided to invest in TruTouch.[19] Takata identified a potential inadequacy in the TruTouch model and engineers at Takata used existing Takata technology and capacitive seat sensors to develop an anti-circumvention mechanism to address that inadequacy.[20] Takata proposed the anti-circumvention component to TruTouch in 2010, knowing that TruTouch was developing the model for ACTS. Therefore, the record supports the Court's conclusion that the Patent Assets were developed "for or on behalf of ACTS."

c. *The Patent Assets were developed under the agreement*

Section 13(a)(i) of the Agreement specifically states that ACTS owns all Work Product which is "developed under this Agreement." As discussed above, the Court has determined that

---

[16] Takata Opening Br. Docket No. 94 ("Question 2 was a three-part invitation to address tampering, circumvention and interferants in a commercial implementation.").
[17] White Tr. 38:14 – 38:19, Docket No. 95.
[18] White Tr. 26:12 – 28:1, Docket No. 95.
[19] White Tr. 30:5 – 31:8, Docket No. 95.
[20] White Tr. 41:22 – 44:22, Docket No. 95.

the Patent Assets constitute Work Product under the definition provided in the Agreement. Now, the Court further determines that the Patent Assets were developed under the Agreement.

Takata first argues that the Patent Assets were completed as a matter of law when it filed the Patent Application on March 9, 2011. Second, it argues that it was not authorized to begin work on behalf of ACTS until it received a duly authorized contract and that ACTS acknowledges that Takata proposed a proprietary method for the circumvention aspect of the sensor. Third, Takata contends that developing anti-circumvention was not a requirement under the Agreement and was not included in the Vehicle Integration Requirements under any Statement of Work ("SOW"). Fourth, none of Takata's deliverables contained any anti-circumvention technology, and last, Takata argues that its invention is "Background IP," which Takata owns.

ACTS challenges Takata's assertions by first arguing that Takata did not have a working model of the invention when it filed the Patent Application. Second, ACTS argues that the SOW involved the blood alcohol sensor and that the sensor incorporated an anti-circumvention component. The overall objective of the SOW was a system that would only measure the driver's blood alcohol content. Third, a mock-up vehicle that Takata provided lacked an operable blood alcohol sensor but did have an anti-circumvention component. Fourth, the parties always understood that the system would include an anti-circumvention element. Finally, Takata failed to claim the Patent Assets as "Background IP" in the Agreements.

The Court focuses on the Agreement and the SOWs agreed to by the parties and concludes that the Patent Assets were developed under the Agreement and therefore belong to ACTS. The first agreement was signed on September 1, 2011 and an amended agreement was signed on March 31, 2014. There were also various SOWs which were incorporated the Agreements.

The "Objectives" sections of the 2011 SOW and the 2013 SOW state as follows:

The overall objective of this Phase II effort is to develop the proof-of-principle prototype (POP Prototype) developed in Phase I for implementation and integration into a research vehicle. When implemented, the subsystem **shall only measure the driver's BAC**[21] in the vehicle cabin environment and output a measurement to the display as per the vehicle integration requirements in Appendix A.[22]

The SOW from 2013 has the same language, ". . . the subsystem shall only measure the driver's BAC."[23]

Although Takata is correct that the words "anti-circumvention" or "anti-spoofing" are not included in the Agreements or the accompanying SOWs, the SOWs do contemplate the anticircumvention concept by stating that the subsystem shall "only measure the driver's BAC." The Court interprets this to mean that only the driver, and not a passenger or other person, will have their BAC measured. In other words, the driver will not be able to circumvent the system by having a passenger touch the sensor.

Next, the Court focuses significant attention on what was not included as Background IP in the Agreement's schedules. In Takata's Opening Brief, it concedes that it ". . . did not list the Patent Assets as Background IP subject to Section 13.b of the Agreement" because the Agreement did not involve developing anti-circumvention technology. However, as noted above, the record reflects that anti-circumvention was contemplated in the SOWs and was a central feature of the project.

As revealed in the deposition testimony of Mr. White, Takata understood that the anti-circumvention component was crucial for the project. Takata knew as of February 28, 2011 that ACTS required an anti-circumvention component in the system that Takata proposed. Takata then

---

[21] App. to Opening Br. in Support of Def. Joyson Safety Systems Acquisition LLC's Mot. for Summ. J. A669, May 23, 2019, Docket No. 95 (emphasis added).
[22] App. A669, Docket No. 95.
[23] App. A833, Docket No. 95.

filed its Patent Application on March 9, 2011. Takata admitted in its Opening Brief that its anti-circumvention invention was "valuable" and that it filed that Patent Application to "preserve TKH's ownership before presenting the invention at the March 10 meeting." Takata took steps in March 2011 to patent its invention but failed to include the invention and the accompanying patent as Background IP in two separate instances.

The Patent Assets were not listed in the 2011 Agreement and were not again not included in the 2014 amendment to the Agreement. In the 2014 amendment to the Agreement, anything that was to be classified as Background IP had to be listed on Schedule C, ". . . and in each case is listed on **Schedule C**." Takata had the opportunity during the initial drafting of the 2011 Agreement and the 2014 amending of the Agreement to simply include the Patent Assets on the designated schedule but did not do so.

## VI.    Conclusion

ACTS originally partnered with TruTouch to develop Phase I of its project. In 2010, Takata invested into TruTouch, and in 2011, Takata was selected by ACTS for Phase II of the project. Takata filed its Patent Application on March 9, 2011 and entered into the Agreement with ACTS on September 11, 2011 after spending a few months negotiating the Agreement's terms.

These sophisticated parties and their professionals entered into the Agreement that defines an effective date for Work Product as of February 9, 2011. The Agreement further delineates that ACTS would own any Work Product developed for or on behalf of ACTS on or after February 9, 2011. The Court finds no genuine dispute of material fact as to the terms of the contract and the consequences of its application. The patent application was filed on March 9, 2011, which consequently puts the development of the Patent Assets after the February 9, 2011 Work Product

timeframe. Further, the Patent Assets were developed "under the Agreement." The Court does not

consider it necessary to consider the remainder of the parties' arguments.

For the foregoing reasons, the Court finds that there are no genuine disputes of material

fact and grants ACTS' motion for summary judgment. Takata's Cross-Motion for summary

judgment is denied. The parties are requested to submit a proposed form of order consistent with

the reasoning stated above within fourteen days of the date hereof.

Dated: June 18, 2020
      Wilmington, Delaware

                                Brendan Linehan Shannon
                                United States Bankruptcy Judge